UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN THE MATTER OF:  
MICHAEL MIELKE AS OWNER OF  
THE M/V MIELKE WAVE  
_____/

Case No. 10-13519  
Hon. Lawrence P. Zatkoff

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse, in the City of Port Huron, State of Michigan, on November 1, 2013

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF  
UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

This matter is before the Court on Claimant St. Clair Marine Salvage Inc.'s Motion for Leave to File First Amended Claim [dkt 58] and Motion for Partial Summary Judgment [dkt 59], and Petitioner Michael Mielke's Motion for Summary Judgment [dkt 60]. The motions have been fully briefed. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the following reasons, St. Clair Marine Salvage Inc.'s Motion for Leave to File First Amended Claim is DENIED; St. Clair Marine Salvage Inc.'s Motion for Partial Summary Judgment is GRANTED in part and DENIED in part; and Petitioner Michael Mielke's Motion for Summary Judgment is GRANTED in part and DENIED in part.

## II. BACKGROUND

**A. FACTUAL BACKGROUND**

On July 1, 2010, at approximately 5:30 p.m., Petitioner Michael Mielke ("Petitioner") and three acquaintances boarded Petitioner's 1983 32-foot Thunderbird Formula boat, the "M/V Mielke Wave" (the "Mielke Wave"), at its dock at the Harbor Club North Marina ("Harbor Club"), which is nestled on Lake St. Clair. Petitioner captained the Mielke Wave north to the Mariner's Boat Club. After socializing (eating and drinking)[1] for several hours, Petitioner and his friends re-boarded the Mielke Wave—with one additional passenger, Cindy Victor—with the intent to return to Harbor Club. The Mielke Wave arrived in the channel of Harbor North at approximately midnight and, based on the suggestion of a passenger, backed out of the channel and headed south toward Jack's Waterfront Restaurant ("Jack's).

Petitioner kept the Mielke Wave one to one and one-half miles off the shoreline and maintained a speed of 23 miles-per-hour. While steering the Mielke Wave toward Jack's, Petitioner testified that he was making a 180-degree sweep of St. Clair Lake in front of him. As the Mielke Wave moved closer to Jack's, Petitioner engaged in a 90-degree turn west, which charted the vessel in a direct course to Jack's. Four or five minutes after making the turn, the Mielke Wave was struck on its port stern side by a 1988 21-foot Wellcraft (the "Wellcraft") at approximately 12:30 a.m., on July 2, 2010. Petitioner testified that he did not visualize the Wellcraft until it was 30 feet from the Mielke Wave. Due to the "high rate of speed" in which the Wellcraft was traveling, Petitioner stated that he "had no time to make any evasive maneuver." Petitioner timely issued a "may day" call and the Macomb County Sheriff's Department ("Sheriff's Department") and United States Coast Guard responded to the scene.[2]

The force of the collision produced an eight-foot hole in the Mielke Wave, and the Wellcraft was largely destroyed. Both vessels began to sink immediately.

---

[1] Petitioner testified that he had two or three beers at the Mariner's Boat Club.
[2] Records from both authorities indicate that a distress call was received at 12:42 a.m., on July 2.

The Sheriff's Department contacted Claimant St. Clair Marine Salvage Inc. "(St. Clair Salvage") around 1:00 a.m., requesting that St. Clair Salvage assist in salving the vessels. Captain William Leslie ("Leslie")[3] fielded the call, boarded a salvage vessel, and arrived at the scene of the accident at 1:20 a.m. Because law enforcement authorities were conducting a search and rescue operation for the Wellcraft's operator, Leslie could not commence salving efforts. In the interim, however, Leslie testified that he deployed containment booms to catch oil and fuel that was leaking from the vessels into Lake St. Clair. Leslie also ordered another salvage vessel to idle near the accident scene to prevent other boats from coming into the area.[4]

Leslie radioed back to St. Clair Salvage's base and asked that a crew, additional salvage vessels, and equipment be assembled to assist in salving the vessels. At 6:34 a.m., the body of the operator of the Wellcraft was discovered by divers from the Sheriff's Department. The divers also searched the Mielke Wave. The police reports generated by the Sheriff's Department illustrate that the dive operations terminated at 7:00 a.m.

St. Clair Salvage's additional four vessels—loaded with equipment and divers—arrived to the collision site at some point after the Sheriff's Department dive operations concluded.[5] St. Clair Salvage also hired a sixty-foot barge and excavator from Bayside Marine Construction ("Bayside"). The plan was to float the Mielke Wave to the surface, and the excavator would be used to position—or roll over—the Mielke Wave such that St. Clair Salvage's divers could properly attach lift bags to the vessel. After the lift bags were affixed, Leslie determined that the eight-foot hole in the port side of the Mielke Wave necessitated patching before it could actually be lifted to the surface. St. Clair Salvage then hired a carpenter and purchased underwater power tools to perform the underwater patch work.

---

[3] Leslie is the operations manager of St. Clair Salvage, and a self-identified "Salvage Master."
[4] Leslie could not recall at his deposition what time the second vessel arrived.
[5] The exact time of these vessels' arrival is unknown.

Once the hole was patched, the lift bags effectively raised the Mielke Wave to the surface of the water. St. Clair Salvage attached lines from the bow of the Mielke Wave to three salvage vessels in an attempt to plane the Mielke Wave. The Mielke Wave's size and weight caused St. Clair Salvage to utilize a fourth salvage vessel. As the Mielke Wave was being pulled, crew members from St. Clair Salvage boarded the Mielke Wave and ran pumps to remove water. Leslie testified that the remaining salvage vessels continued to deploy containment booms to contain spilled oil and fuel. In the end, Leslie estimates that approximately 10 gallons of oil and fuel were contained.

The Mielke Wave was tugged to St. Clair Salvage's facility in Harrison Township—Hideaway Harbor marina ("Hideaway Harbor")[6]—where it was hoisted and stored.[7] Petitioner approximates that the Mielke Wave was hoisted from the water between 2:30–3:00 p.m. on July 2. Petitioner was allowed access to his vessel a couple weeks after the accident to retrieve personal belongings. Prior to October 18, 2010, the Mielke Wave was re-located from Hideaway Harbor to a remote lot. Leslie could not recall when the Mielke Wave was moved, but states that the remote lot was owned by Hideaway Harbor.

Several months after the accident, St. Clair Salvage alleges that it sent Petitioner an invoice for salvage and storage charges. Shortly after that, St. Clair also claims it sent Petitioner an invoice for winterization charges. To date, no payment has been tendered on either invoice.

**B. PROCEDURAL BACKGROUND**

Petitioner filed his petition for exoneration from or limitation of liability pursuant to 46 U.S.C. § 30501, *et seq.*, on September 3, 2010 [dkt 1]. On October 1, 2010, the Court issued a notice requiring that any and all claims with respect to which Petitioner seeks limitation were to be filed by December 1, 2010, in accordance with Supplemental Admiralty Rule F(4).

---

[6] Hideaway Harbor shares facilities with St. Clair Salvage. Both are owned by the same two individuals.
[7] Leslie testified that he received "one or more letters from attorneys" stating that St. Clair Salvage continue to store the Mielke Wave because it was evidence in the limitation action filed by Petitioner.

Individual Claimants Nicholas Martin, Walter Morey and Jody Manerndach—all passengers on the Wellcraft—and Cynthia Victor—a passenger on the Mielke Wave—filed personal injury claims against Petitioner. Additionally, St. Clair Salvage filed a claim seeking payment for (1) salvage and environmental services, (2) storage charges, and (3) winterization charges. On January 12, 2011, Petitioner filed a counterclaim against St. Clair Salvage, arguing that all of St. Clair Salvage's charges violate the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq*.

Petitioner and St. Clair Salvage filed motions for summary judgment, both of which are currently pending before the Court.

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S.

at 323. The moving party discharges its burden by "'showing'–that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

### A. MOTION FOR LEAVE TO FILE FIRST AMENDED CLAIM

As a preliminary matter, the Court first addresses St. Clair Salvage's motion for leave to file a first amended claim, which was filed on the same day that St. Clair Salvage and Petitioner submitted their motions for summary judgment. St. Clair Salvage argues that its proposed first amended claim does not add new or unknown claims, but rather advances a more particularized statement of facts and crystalizes the legal underpinnings of its claims.

Pursuant to Fed. R. Civ. P. 15(a)(2), leave to amend shall be "freely give[n] . . . when justice so requires," but "that window of opportunity does not remain open forever." *Shane v. Bunzl Distribution USA, Inc.*, 275 F. App'x 535, 536 (6th Cir. 2008). "A motion to amend a complaint should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995) (citing *Ford v. Ford*, 371 U.S. 187 (1962)). When a party seeks to amend its complaint at a late stage of the litigation, "there is an increased burden to show justification for failing to move earlier." *Wade v. Knoxville Utilities*

*Bd.*, 259 F.3d 452, 459 (6th Cir. 2001) (citing *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)).

The Court first notes that St. Clair Salvage waited approximately two years before moving for leave to file its first amended claim. And, even though it appears that St. Clair Salvage's current counsel[8] acted expeditiously in filing the motion for leave, the Court would be remiss to completely ignore the fact that almost two years passed before the requested amendment was presented. During that time, St. Clair Salvage had ample opportunity to seek leave from the Court, but failed to do so. Nonetheless, the Sixth Circuit has made clear that "[d]elay by itself is not sufficient reason to deny a motion to amend." *Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir. 1994) (citation omitted). It follows, then, that the relevant inquiry becomes whether permitting such amendments would cause Petitioner to suffer prejudice.

St. Clair Salvage's original Claim against Petitioner—though vaguely drafted—contains only a claim based on salvage law. Its proposed amendments, however, include two entirely novel and distinct legal theories: unjust enrichment and promissory estoppel. Permitting leave to amend at this posture in the litigation would be especially prejudicial to Petitioner, given the fact that discovery has already closed and that Petitioner brings its motion for summary judgment based on St. Clair Salvage's original Claim for a pure salvage award. *See Corning v. Nat'l Union Fire Ins. Co.*, 257 F.3d 484, 496–97 (6th Cir. 2001). The Court finds St. Clair Salvage's delay unwarranted and prejudicial to Petitioner, and therefore denies its motion for leave to file its first amended claim. Thus, to the extent that St. Clair Salvage relies upon theories of unjust enrichment and promissory estoppel to recover storage and winterization charges, recovery under those theories is denied.

## B. MOTIONS FOR SUMMARY JUDGMENT

St. Clair Salvage's motion for partial summary judgment seeks a ruling that the services it rendered to the Mielke Wave entitle it to a salvage award in an amount to be determined by the Court.

---

[8] St. Clair Salvage retained its current counsel in September of 2012.

Further, St. Clair Salvage argues that the Court should grant it summary judgment on Petitioner's counterclaim.

The crux of Petitioner's motion for summary judgment is two-fold. Petitioner first contends that analysis of applicable salvage law limits St. Clair Salvage's potential recovery, if any, to the post-casualty value of the Mielke Wave. In any event, Petitioner argues, St. Clair Salvage's charges for salvage and storage violate the Michigan Consumer Protection Act.

### i. SALVAGE LAW

"Salvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from pending peril on the sea . . . ." *The Blackwall*, 77 U.S. (10. Wall.) 1, 12 (1869). Pure salvage services are rendered "voluntar[ily], wherein the compensation is dependent upon success[.]" *The Elfrida*, 172 U.S. 186, 192 (1898).

A pure salvage claim requires proof of three elements: (1) marine peril; (2) the salvage must be voluntarily rendered; and (3) the salvor must be successful, in whole or in part, or that the services rendered contributed to such success. *The Sabine*, 101 U.S. 384, 384 (1879). Here, Petitioner only seriously disputes that St. Clair Salvage provided "voluntary" services.

According to Petitioner, Leslie's testimony establishes that St. Clair Salvage and the Sheriff's Department have an agreement whereby St. Clair Salvage provides salvage services for specific areas of Lake St. Clair. In other words, Petitioner contends, St. Clair Salvage's "on-going special relationship" with the Sheriff's Department demonstrates that its response to the scene of the accident was not voluntary, but rather was based on "their standing agreement."

Be that as it may, Petitioner's argument misses the mark. First, Petitioner fails to offer evidence of any such "standing agreement" between St. Clair Salvage and the Sheriff's Department. Second, even assuming that the foregoing parties did, in fact, have a contractual relationship, such an agreement would

8

be irrelevant. Determination of whether the salvage services were voluntarily rendered turns instead on the existence or non-existence of a binding contact between the salvor (St. Clair Salvage) and the vessel owner (Petitioner). *See In re Complaint of The City of New York, as Owner and Operator of M/V Andrew J. Barberi*, 534 F. Supp. 2d 370, 378 (E.D. N.Y. 2008) (citation omitted). And, based on the record evidence before the Court, it is beyond dispute that St. Clair Salvage did not contract with Petitioner to provide salvage services for the Mielke Wave on July 2, 2010—nor did they have a contract in existence prior to that date. Thus, Petitioner—as the vessel owner—failed to carry his burden of proof demonstrating the existence of a binding contract. *Joseph v. J.P. Yachts, LLC*, 436 F. Supp. 2d 254, 267 (D. Mass. 2006) (citation omitted). *See also The Camanche*, 75 U.S. (8 Wall.) 448 (1869) ("Nothing short of a contract to pay a given sum for the service to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage.").

Having determined that St. Clair Salvage has satisfied the elements of a pure salvage claim, the Court next embarks on fashioning an appropriate award.

### ii. SALVAGE AWARD

In *Blackwall*, *supra*, the Supreme Court listed six factors district courts should consider when fixing awards for salvage services: (1) the labor expended by the salvors in rendering the salvage service; (2) the promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; (4) the risk incurred by the salvors in securing the property from the impending peril; (5) the value of the property saved; and (6) the degree of danger from which the property was rescued. 77 U.S. (10 Wall.) at 14.

9

The *Blackwall* factors were closely adopted—though with differing language—by the International Convention on Salvage, 1989. *See* International Convention on Salvage, Apr. 28, 1989, S. Treaty Doc. NO. 102-12, 1953 U.N.T.S. 193 (hereafter referred to as "Salvage Convention 1989").[9] Article 13(1) of the Salvage Convention 1989 states:

> The reward shall be fixed with a view to encouraging salvage operations, taking into account the following criteria without regard to the order in which they are presented below:
>
> (a) the salved value of the vessel and other property;
>
> (b) the skill and efforts of the salvors in preventing or minimizing damage to the environment;
>
> (c) the measure of success obtained by the salvor;
>
> (d) the nature and degree of the danger;
>
> (e) the skill and efforts of the salvors in salving the vessel, other property and life;
>
> (f) the time used and expenses and losses incurred by the salvors;
>
> (g) the risk of liability and other risks run by the salvors or their equipment;
>
> (h) the promptness of the services rendered;
>
> (i) the availability and use of vessels or other equipment intended for salvage operations;
>
> (j) the state of readiness and efficiency of the salvor's equipment and the value thereof.

Salvage Convention 1989, art. 13(1). Importantly, under article 13, the reward "*shall not exceed* the salved value of the vessel and other property." *Id.* at art. 13(3) (emphasis added). The Court will discuss the article 13 factors below.

---

[9] The Salvage Convention 1989 became part of the law of the United States on July 14, 1996.

### a. The Nature and Degree of the Damage; The Salved Value of the Vessel and other property

The parties do not dispute that the nature and degree of damage to the Mielke Wave was significant. As a result of the collision with the Wellcraft, the Mielke Wave sustained an eight foot hole on its port side. Further, neither party disputes that the salved value of the Mielke Wave post-casualty is, at most, $3,000.00. In fact, John Trost—an accredited marine surveyor and licensed insurance adjuster—found the post-casualty value of the Mielke Wave to be $3,000.00 based on the following: (1) the vessel's hull was structurally destroyed and the vessel was fully submerged into Lake St. Clair; (2) all unsealed electrical components and upholstered components were destroyed; and (3) successful preservation of the twin engines. As such, the Court considers $3,000.00 to represent the reasonable and accurate salved value of the Mielke Wave. And, in accord with subsection 3, any salvage award fashioned under article 13 "shall not exceed" that amount.

### b. The Skill and Efforts of the Salvors in Preventing or Minimizing Damage to the Environment[10]

Article 1(d) defines damage to the environment as "substantial physical damage to human health or to marine life or resources in coastal or inland water or areas adjacent thereto, caused by pollution, contamination, fire explosion or similar major incidents." Salvage Convention 1989, art. 1(d). St. Clair Salvage argues that, had it not deployed the containment booms throughout the salvage process, "potentially hundreds of gallons of fuel and oil and lead would have leaked into Lake St. Clair." Its actions, the argument goes, therefore prevented or minimized environmental damage.

Yet, aside from this conclusory statement, St. Clair Salvage offers no substantive evidence proving that it actually *prevented* or *minimized* damage to the environment. Notably, Leslie estimated at his deposition that the containment booms only captured approximately 10 gallons of oil and fuel—

---

[10] The drafters of the Salvage Convention 1989 introduced this criterion to encourage salvors to assist ships that threaten damage to the environment.

11

hardly indicating that St. Clair Salvage prevented or minimized much of anything, let alone "substantial" damage. Because evidence demonstrating prevention or minimization is required, the Court finds this factor to be of little weight here.

### c. The Measure of Success Obtained by the Salvor

When St. Clair Salvage arrived at the accident scene, the Mielke Wave was either mostly or entirely submerged in the water. Given that the Mielke Wave remained submerged for many hours and still retained a salvage value of $3,000.00, it appears that St. Clair Salvage was, at least, partially successful in its salving efforts.

### d. The Skill and Efforts of the Salvor in Salving the Vessel, Other Property and Life

St. Clair Salvage is a professional salving company, whose operations manager, Leslie, has been involved in the salving business since 1979. Undoubtedly, Leslie's acumen played an integral role in—what the Court views as—the rendering of skillful services.

After assessing the circumstances and conditions, Leslie determined that the Mielke Wave could best be salved by floating it to the surface of the water. In order to implement that plan, Leslie rented a 60-foot barge equipped with an excavator. The excavator was then utilized to position (or roll) the Mielke Wave so that lift bags could be affixed to the vessel. Because the eight-foot hole in the Mielke Wave's port side limited the effectiveness of the lift bags, Leslie dispatched an underwater carpentry crew to patch the hole. And finally, as the Mielke Wave was brought to the surface, Leslie ordered that crew members of St. Clair Salvage employ water pumps on the Mielke Wave so that the vessel could be planed to safety. In the end, the Court finds this factor weighs in favor of conferring an award to St. Clair Salvage commensurate with its aptitude.

### e. The Time Used and Expenses and Losses Incurred by the Salvors

St. Clair Salvage submits an invoice, dated July 2, 2010, as proof of its time and expenses incurred. After examining the entire record, however, the propriety of these charges is questionable.

First, St. Clair Salvage's invoice includes the following charge: four (4) salvage vessels at $400 per hour, for 12 hours, for a total of $19,200.00. Presumably, these four (4) salvage vessels represent the ones that pulled and planed the Mielke Wave to Hideaway Harbor. Although Leslie testified that he arrived at the scene shortly after the accident, he also testified that St. Clair Salvage's salvage efforts commenced, at the earliest, at 7:00 a.m. Thus, these four (4) salvage vessels reached the site at some point *after* that time. As such, the Court finds this charge to be overstated.

Second, the invoice contains a "Salvage Award" of $25,000.00 and "Salvage Master" charge of $2,500.00. These charges appear to be duplicative, as one's status as a salvage master is likely considered in determining an appropriate salvage award. Moreover, while the Court does not make lightly of St. Clair Salvage's efforts, unilaterally awarding itself an amount more than eight times the post-casualty value of the Mielke Wave is excessive and, importantly, foreclosed by article 13(3) of the Salvage Convention 1989.

Third, St. Clair Salvage's attempt to charge two master divers at $250.00 per hour, for 12 hours, is likewise erroneous. The divers were utilized to attach the lift bags to the Mielke Wave. But, as mentioned above, this could not have occurred until after 7:00 a.m.

Fourth, the "Emergency Hoist fee" of $1,200.00 appears partially overstated. Leslie testified that the hoist St. Clair Salvage uses is owned by Hideaway Harbor, and that Hideaway Harbor does not charge St. Clair Salvage a fee for using it. Additionally, St. Clair Salvage's website, as of 2011, states that "[e]mergency hoist fees are based on a [sic] $20.00 per ft. model." The Mielke Wave is a 32-foot vessel and would therefore yield a hoist fee of $640.00.

Last, St. Clair Salvage charged Petitioner $5,000.00 for the barge and excavator rental. Yet, Bayside—the company from which the barge and excavator were rented—invoiced St. Clair Salvage only $1,200.00. It is certainly reasonable for St. Clair Salvage to cover its own expenses, but charging a price equivalent to approximately 400 percent of its cost is extreme.

In sum, despite St. Clair Salvage's claim to $58,900.00 in salving expenses, the Court concludes that its expenses are, as a whole, overstated. Accordingly, this factor provides little guidance in fashioning an appropriate salvage award.

### f. The Risk of Liability and Other Risks Run by the Salvors or their Equipment

The chief risks inherit in St. Clair Salvage's salvage services were two-fold. First, its divers were exposed to released hydrocarbons from the vessels' oil and fuel. According to Leslie, because hydrocarbons congregate at the water surface level, the divers could have inhaled the molecules through their ventilation equipment. Second, the divers—when employing the lift bags while the excavator simultaneously rolled the Mielke Wave—were subject to the Mielke Wave potentially falling in a compromising manner.

### g. The Promptness of the Services Rendered

The Mielke Wave and the Wellcraft collided at 12:48 a.m. on the morning of July 2, 2010. Leslie responded to the scene with commendable speed by approximately 1:20 a.m. Further, there is nothing in the record to suggest that, but-for the Sheriff's Department's search and rescue efforts, the salving would not have commenced promptly after Leslie's arrival. When St. Clair Salvage began its salvaging services, it appears that such services were timely administered.

**h. The Availability and Use of Vessels or Other Equipment Intended for Salvage Operations; The State of Readiness and Efficiency of the Salvor's Equipment and the Value thereof**

St. Clair Salvage is a well-equipment professional salving company, and one of two primary salvage companies located on Lake St. Clair. It has an investment in ten salvage vessels, with an approximate value of $500,000.00, various salving and safety related gear and equipment, including lift bags, and three trucks and a forklift. St. Clair Salvage employs 12 captains, two full-time office personnel, three part-time dispatchers, and three commercial divers (one of which is on call 24 hours a day).

Petitioner makes much of the fact the St. Clair Salvage originally desired to rent a 120-foot barge and crane capable of lifting the Mielke Wave from the water, but was unsuccessful in doing so. If St. Clair Salvage had acquired that barge, Petitioner argues, the salvage process would have been less arduous. The Court finds this argument unavailing. First, there is no way of knowing that use of the 120-foot barge would have resulted in a more expeditious salving process—that argument is based on pure conjecture. And second, St. Clair Salvage's inability to rent that barge was due to circumstances beyond its control. The barge in question was loaded with fireworks in preparation for July 4 festivities.

St. Clair Salvage has demonstrated that its equipment was ready and efficient.

**j. Salvage Award**

"Compensation as salvage is not viewed by the admiralty courts merely as pay, on the principle of a quantum meruit, . . . but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." *Blackwall*, 77 U.S. (10 Wall.) at 14. Based on a scrupulous examination of the Article 13(1) factors listed above, and the policy justifications surrounding salvage awards, the Court concludes that St. Clair Salvage is entitled to a salvage award of $3,000.00.

The Court will next consider whether St. Clair Salvage is entitled to recover its expenses.

### iii. SPECIAL COMPENSATION

Independent of its claim for a salvage award, St. Clair Salvage seeks to recover from Petitioner expenses incurred in salving the Mielke Wave. Under the Salvage Convention 1989, "special compensation" can be paid to a salvor that has carried out salvage operations on a vessel that by itself or its cargo threatened damage to the environment. Article 14(1) provides:

> If the salvor has carried out salvage operations in respect of a vessel which by itself or its cargo threatened damage to the environment and has failed to earn a reward under article 13 at least equivalent to the special compensation assessable in accordance with this article, he shall be entitled to special compensation from the owner of that vessel equivalent to his expenses as herein defined.

Salvage Convention 1989, art. 14(1). Thus, payment is contingent upon such expenses exceeding the salvage award payable under article 13—in this case, $3,000.00. If the salvor is successful in *preventing* or *minimizing* damage to the environment, the "special compensation" may be increased by an increment of up to 30 percent of the salvor's expenses or, in exceptional cases, by an increment of up to 100 percent. *Id.* at art. 14(2). Importantly, though, article 14 only authorizes compensation for "out-of-pocket expenses" reasonably incurred by the salvor in the salvage operation and a "fair rate" for equipment and personnel actually and reasonably employed. *Id.* at art. 14(3).

Although article 14(1) is framed only in terms of a perceived threat, the Court nevertheless determines that St. Clair Salvage failed to prove that the Mielke Wave threatened "substantial physical damage to human health or to marine life or resources in coastal or inland waters or areas adjacent thereto . . . ." "Substantial" is defined as "considerable in quantity[–]significantly great." *See* Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/substantial (defining substantial in relevant part). There is simply nothing in the record to suggest that the Mielke Wave was, for example, leaking oil and fuel at such a rapid rate that—if left uncontained—threatened "substantial"

16

environmental injury to marine life or human health. Accordingly, St. Clair Salvage is not entitled to its expenses under article 14(1). Furthermore, because St. Clair Salvage likewise failed to offer evidence that its environmental remediation efforts actually "prevented or minimized" damage, article 14(2) is inapplicable here. *See*, *supra*, Section IV, B, ii, b – The Skill and Efforts of the Salvors in Preventing or Minimizing Damage to the Environment.[11]

### iv. STORAGE AND WINTERIZATION

Finally, the Court briefly addresses St. Clair Salvage's claim for storage fees and winterization. St. Clair Salvage argues that it is entitled to payment for storage charges of the Mielke Wave in the amount of $108,288.40 (as of the date in which its motion was filed). St. Clair Salvage further asserts that it is entitled to charges for winterizing the Mielke Wave's twin engines in the amount of $533.77. These arguments are devoid of merit for at least two reasons.

First, to the extent that St. Clair Salvage is claiming storage and winterization fees grounded on theories on unjust enrichment and promissory estoppel, the claims must be dismissed. As recounted in Section IV, A, *supra*, St. Clair Salvage's desire to proceed under those theories is denied, given that such theories were never advanced before seeking leave to amend its Claim. Second, St. Clair Salvage offers no legal authority establishing that storage and/or winterization fees can be recovered as part of a salvage award pursuant to the Salvage Convention 1989. On these bases, the Court denies storage and winterization fees to St. Clair Salvage.

---

[11] Petitioner argues that article 18 of the Salvage Convention 1989—which prevents payment due under the Convention if the salvor engaged in fraud or dishonest conduct—bars St. Clair Salvage's claim for a salvage award and expenses. Though the accuracy of St. Clair Salvage's charges is questionable, there is certainly nothing in the record to suggest that St. Clair Salvage's conduct rose to the level of fraud.

**v. MICHIGAN CONSUMER PROTECTION ACT**

Petitioner's motion seeks summary judgment on his counterclaim, which alleges that St. Clair Salvage's salvage and storage charges[12] violate the Michigan Consumer Protection Act ("MCPA"). In essence, Petitioner claims that these charges are "excessive" and a "misrepresentation of services rendered," thus constituting prices that are "grossly" in excess of similarly offered services.

The MCPA prohibits unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce. Mich. Comp. Laws § 445.903(1). Nonetheless, the MCPA does not apply to "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or office acting under statutory authority of this state or the United States." *Id.* at § 445.901(1)(a). "[T]he relevant inquiry is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Liss v. Lewiston-Richards, Inc.*, 732 Mich. 203, 212 (2007) (citation and quotation marks omitted).

First, any attempt by Petitioner to argue that the storage fees do not fall within the gambit of the MCPA's exemption provision is disingenuous. The Michigan Marine and Boatyard Act, Mich. Comp. Laws § 570.371, *et seq.*, regulates the storage and repair of vessels. The Act provides, in relevant part: "A facility owner has a possessory lien on property stored at that facility for storage, rent, labor, materials, supplies, and other charges . . . ." Mich. Comp. Laws § 570.373(1). Thus, because the general transaction—storage of the Mielke Wave—is specifically authorized by State statute, that transaction is exempt under the MCPA.

Moreover, Petitioner's claim that the salvage charges violate the MCPA is similarly without merit. The Salvage Convention 1989—a self-executing treaty—came into force internationally on July 14, 1996, and thereby became the "supreme law of the land" in the United States pursuant to the

---

[12] In the interests of justice, the Court will address Petitioner's counterclaim as it relates to the storage charges, even though the Court has already denied St. Clair Salvage entitlement to such fees.

Constitution. *See* U.S. Const. art. VI, § 2. The general transaction here—salvage operations—is undoubtedly authorized by the Salvage Convention 1989 and therefore the MCPA exemption provision applies to bar this aspect of Petitioner's counterclaim.

In short, the Court finds no genuine dispute that Petitioner's counterclaim is precluded by the MCPA's exemption provision. As such, the Court grants St. Clair Salvage summary judgment on Petitioner's counterclaim.

## V. CONCLUSION

Accordingly, for the reasons stated above, IT IS HEREBY ORDERED that St. Clair Salvage's Motion for Leave to File First Amended Claim [dkt 58] is DENIED.

IT IS FURTHER ORDERED that St. Clair Salvage's Motion for Partial Summary Judgment [dkt 59] is GRANTED in part and DENIED in part. St. Clair Salvage's motion is granted to the extent that it is entitled to a salvage award of $3,000.00 from Petitioner, and that Petitioner's counterclaim is dismissed. St. Clair Salvage's motion is denied to the extent that it seeks expenses and storage and winterization fees.

IT IS FURTHER ORDERED that Petitioner's Motion for Summary Judgment [dkt 60] is GRANTED in part and DENIED in part. Petitioner's motion is granted to the extent St. Clair Salvage is denied recovery for expenses and storage and winterization fees. Petitioner's motion is denied to the extent that his counterclaim is dismissed and St. Clair Salvage is entitled to a salvage award of $3,000.00.

IT IS FURTHER ORDERED that Petitioner's Ex-Parte Motion for Leave to File Reply Brief in Excess of Five Page Limit [dkt 68] is GRANTED.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff<br>U.S. District Judge

Dated: November 1, 2013